## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) **The United Keetoowah Band of Cherokee Indians in Oklahoma**, a federally recognized Indian tribe, as parens patriae for the subject Minor Child, and
(2) **Kelly Pritchett Evan**, an individual and next friend of the subject Minor Child

        Plaintiffs,

v.

(1) **T. Luke Barteaux**, Presiding District Judge Judge for the District Court of the Cherokee Nation of Oklahoma, a federally recognized Indian tribe,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:20-cv-00008-GKF-JFJ

## AMENDED COMPLAINT

Plaintiffs United Keetoowah Band of Cherokee Indians of Oklahoma (referred to herein as the "UKB" or "Keetoowah"), and Kelly Pritchett Evan, next friend (referred to herein as "Pritchett") (both collectively referred to herein as "Plaintiffs") file this Amended Complaint under Fed. R. Civ. P. 15(B) ("A party may amend its pleading once as a matter of course within: . . . 21 days after service of a motion under Rule 12(b) . . . ."). Plaintiffs file this Amended Complaint seeking a writ of habeas corpus under the Indian Civil Rights Act of 1968 (25 U.S.C. §§ 1301-1303) for relief from the unlawful detention of a minor Keetoowah child, the unwarranted exercise of jurisdiction over Keetoowah children, and the unjustified deprivation of fundamental liberty interests by the Cherokee Nation of Oklahoma ("CNO"), which is *not* the Indian child's tribe under the Indian Child Welfare

Act, 25 U.S.C. § 1903(5)(b), without due process of law. This Court is the only forum available to test the legality of these actions. In addition, Plaintiffs bring this action for declaratory and injunctive relief and pray that this Court vacate and set aside any Orders purporting to secret a Keetoowah child away from his family and tribe of origin, and to free said child for adoption by individuals who do not share in the child's Keetoowah blood and rich cultural heritage. Accordingly, Plaintiffs present the following statement of their claims entitling them to relief:

## INTRODUCTION

1.     By virtue of migration in the early 1800s and the 1830 Indian Removal Act and its subsequent iterations, Native American populations from across the United States were relocated to "Indian Territory." The UKB and the CNO are just two of nearly 40 federally recognized Indian tribes now tethered to the State of Oklahoma. Because of "pan-Indian" cultural activities such as the modern-day "powwow," many Native American people in the State of Oklahoma intermarry and may possess the Indian blood of multiple tribes.

2.     This lawsuit arises from the indiscriminate seizure and placement of Native American children by the CNO—funneled through a pipeline facilitated by the CNO Indian Child Welfare authorities and protected by its court system—without regard to the tribal membership of such children.

3.     The CNO has shown its aggression—throughout the country—with respect to the preservation and enforcement of its own rights to intervene in, monitor and transfer Indian child welfare cases from state courts of general jurisdiction to its own tribal court

system. *See, e.g.*, *In the Matter of Baby Boy L*, 103 P.3d 1099 (Okla. 2004). The CNO receives more federal dollars vis-à-vis other Tribes under Title IV of the Social Security Act and effectively outspends other Tribes in the implementation of its campaign. The CNO manipulates the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901 *et seq.*—strategically—as a sword and a shield to serve its own interests.

4.      However, as elaborated below, the CNO tribal court system is woefully unable and unwilling to provide a fair and competent forum for the adjudication of these cases.

5.      Nevertheless, the ICWA, as applied, enables the CNO to plow juvenile deprived proceedings from state courts into its own tribal court system and through an adoption pipeline where it appears to dole out Indian children with impunity, often in derogation of the rights of individuals and even other federally recognized Indian tribes.

6.      Upon information and belief, many CNO officials and employees have engineered their own families in this manner and adopted their own children under the auspices of this system. Upon information and belief, CNO operates what may be the largest, most sophisticated adoption agency in the world—a black-market baby pipeline in which the CNO courts, law enforcement agencies, prosecutorial authorities and lawmakers are complicit.

7.      The ICWA was enacted for the purpose of preserving Indian cultural values, thought to be imperiled whenever Indian children were removed from their families of origin and placed in non-Indian foster or adoption homes.

8.      In the mid-1970s, there was rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their

families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013) (quoting 25 U.S.C. § 1901(4)). "This wholesale removal of Indian children from their homes prompted Congress to enact the ICWA, which establishes federal standards that govern state-court child custody proceedings involving Indian children." *Id.* (internal citations omitted).

9.    The ICWA commands state agencies and courts, when seeking foster care placement of, or termination of parental rights to, an Indian child, to comply with heightened notice requirements and recordkeeping standards. The ICWA lengthens the timelines for procedural benchmarks in any covered case (including the time limits for appeal) and requires state agencies charged with serving children in foster care and adoption proceedings to use "active efforts" and provide additional remedial services to prevent the breakup of the family. The ICWA imposes a heightened burden of proof of "evidence beyond a reasonable doubt" (above and beyond the "clear and convincing evidence" standard) with regard to termination proceedings.

10.    The ICWA invests the Indian tribe with a mandatory right to monitor and intervene at any point in the proceedings. 25 U.S.C. § 1911(c).

11.    The ICWA also gave rise to a new "best interests" standard – that is, the "best interests of the Indian tribe," as separate and distinct from the best interests of the child.

This dispute begs the question of "which Indian tribe" in an instance where there is more than one tribe of origin with an interest in the health and welfare of a minor child.

12.    When a state agency or state court believes the child is an Indian child, the court must confirm, through "a report, declaration, or testimony included in the record," that the state agency or other party used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member (or eligible for membership). *See* 25 C.F.R. § 23.107(b).

13.    Only the Indian tribe of which it is believed the child is a member (or eligible for membership) may determine whether the child is a member of the tribe or eligible for membership. *See* 25 C.F.R. § 23.108(a). "The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." *See id.* at § 23.108(b). Only when the tribes disagree about the child's membership may the state courts designate the tribe to which the child belongs, and the Code provides criteria the courts must use in making that designation. *See id.*, § 23.109(c)(2).

14.    The foregoing procedural safeguards are designed to prevent the breakup of Indian families and the breakdown of the Indian culture. However, the CNO does not offer such protections to those caught in its Indian child welfare system.

15.    The CNO Code requires Cherokee authorities to ascertain the tribal membership of allegedly deprived children and to notify any interested Tribe. However, upon information and belief, other tribes routinely are not notified of tribal proceedings and,

furthermore, are not allowed to participate meaningfully in child placement decisions by CNO.

16.     Furthermore, in the administration of its Indian child welfare system, the CNO imposes heightened and hyper-technical suitability criteria for not only biological parents but also extended Indian family members who seek consideration as foster and adoptive placement—resulting in the removal of children from biological families who are steeped in Native American culture and the subsequent placement of those children in CNO families with marginal cultural connection and decimal amounts of Indian blood, and turning the policy underpinning of ICWA on its head. Due to the stringent criteria and standards imposed by CNO, many Native American families would in fact fare better in the courts of the conqueror.

## PARTIES AND JURISDICTION

17.     Plaintiff UKB is a federally recognized Indian tribe, which, after recognition from Congress, organized under the Oklahoma Indian Welfare Act in the late 1940s. Act of Aug. 10, 1946, ch. 947, 60 Stat. 976; Act of June 26, 1936, ch. 831, 49 Stat. 1967–1968 (codified at 25 U.S.C. §§ 5201–5210). As such, the UKB is entitled to sovereign immunity from suit and cannot be sued in any court without its express and unequivocal consent. By filing this Complaint, the UKB does not waive its sovereign immunity from suit regarding any matter, related or unrelated to, the claims at issue in this proceeding. The UKB is the "Indian child's Tribe" as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(5)(b), for the Minor Child.

18.     Plaintiff Pritchett is an enrolled member of the UKB and is the biological, paternal aunt and former foster mother of the minor child described hereinbelow. Pritchett is an "extended family member" of the Minor Child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(2). The UKB is the tribe of origin of the minor child. Accordingly, both the UKB and Pritchett stand as parens patriae and next friend entitled to habeas review and relief.

19.     Defendant T. Luke Barteaux (referred to herein as "Barteaux") is an associate judge for the CNO District Court. Upon information and belief, Barteaux is a resident of Tulsa County, State of Oklahoma. The CNO is a federally recognized Indian tribe organized in 1976. The CNO encompasses lands in Tulsa, Adair, Cherokee, Craig, Delaware, Mayes, McIntosh, Muskogee, Nowata, Ottawa, Rogers, Sequoyah, Washington and Wagoner Counties. Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391(b).

20.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution, laws or treaties of the United States, raising the federal question of the scope of adjudicative jurisdiction of CNO.

21.     Federal question jurisdiction also is conferred by 25 U.S.C. § 1303, which provides that "[t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.", Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1302 and 1303, The ICRA prohibits Defendant from depriving Minor Child of a fundamental liberty interest without due process of law. Plaintiffs represent Minor Child as parens patriae and next friend respectively.

## GENERAL FACTUAL BACKGROUND

22.     Plaintiff UKB has been a federally recognized Indian tribe since the 1940s. The UKB trace their lineage from the Western Cherokees and Old Settlers who had a reservation in Arkansas in the early nineteenth century. The UKB agreed to relinquish its Arkansas reservation for a reservation in Oklahoma by virtue of an 1828 treaty with the United States. While UKB has a long historical relationship with the CNO, it is an independent and autonomous tribe. Under the Constitution of the UKB, the governing body of UKB is called the "Council," which has the power to transact business or otherwise speak or act on behalf of the Tribe. On a daily basis, the UKB government provides or administers essential social services to its citizens. The UKB possesses its own court system and Indian Child Welfare agency. The UKB never has authorized the CNO to exercise general jurisdiction over UKB, its lands, or its children.

23.     The UKB prides itself on the strong cultural connections maintained and preserved by its membership. Many UKB members speak the Cherokee language fluently; the stomp dance tradition, the clan system, and other aspects of traditional Cherokee culture are greatly valued and strongly retained.

24.     The UKB imposes more stringent membership criteria than does the CNO. While many enrolled members of CNO possess a mere scintilla of Indian blood (with many CNO members possessing less than one percent degree of Indian blood), the UKB requires that its members possess at least one-fourth degree of Cherokee blood.

25.     The service area of the UKB and the CNO is coterminous, and, partially due to its enormous tribal citizenship, the CNO historically has maintained a stranglehold on

8

federal dollars set aside for healthcare, education, housing and other vital services for the local Native American population.

26.      In addition, CNO successfully has blocked UKB in the pursuit of casino gaming and other economic development initiatives. As a result, CNO has enjoyed economic growth and prosperity while UKB has faltered. UKB members (who generally are identifiably Indian) suffer comparative economic disadvantage and social disfunction vis-à-vis CNO members who often times "blend" into Anglo-American society phenotypically, socially, economically and otherwise.

27.      The CNO has constructed hospitals and clinics throughout its overlapping service area whereas the UKB possesses no medical facilities of its own. The CNO maintains a state-of-the-art hospital in Tahlequah known as the Hastings Medical Center (referred to herein as "Hastings") which provides, inter alia, maternity and delivery services.

28.      Like other medical facilities, Hastings staff members are attuned to the opiate and methamphetamine epidemic in Oklahoma. When an expectant mother or her child appear to be under the influence of such substances, Hastings will alert child protective authorities—more specifically, the Indian Child Welfare Department of CNO (referred to herein as "CNO ICW"), but not the Indian Child Welfare Department of the UKB, even in cases where the UKB is the Indian child's tribe. CNO prosecutorial authorities will then initiate juvenile deprived proceedings in the CNO District Court, without notifying the UKB Indian Child Welfare Department.

## A.    The Anatomy of a CNO District Court Juvenile Deprived Proceeding

29.    Once a juvenile deprived proceeding is commenced in CNO District Court, the child becomes a ward of such court. CNO then positions itself as the guardian or custodian of the minor child who is the subject matter of the proceedings, regardless of whether it is the Indian child's tribe under ICWA.

30.    The Tribal Council of the CNO has enacted a law, known as the "Temporary Automatic Citizenship Ordinance," which permits CNO to automatically enroll a minor child over which it exercises custody as a member of the CNO, regardless of whether the child also may be eligible for membership in any other federally recognized Indian tribe. *See* 11 CNCA § 11A (temporary automatic citizenship of newborn children).

31.    The CNO Code requires its child welfare authorities to ascertain the Indian identity of a deprived child and to notify all tribes of origin. *See* 10 CNCA § 40.4 (the Nation "shall send notice to the parents . . . and to the tribe that may be the tribe of the Indian child" (emphasis added). Further, the Nation "shall seek a determination of the Indian status of the child" if the Nation "has been informed by an interested party . . . that the child is Indian," 10 CNCA § 40.3 (C)(1), and "shall seek the verification of the Indian status of the child from the Indian Tribe." 10 CNCA § 40.3(D).

32.    With regard to the Juvenile Deprived Proceeding involving the minor child, the Executive Director of CNO ICW testified, in the presence of undersigned counsel for Plaintiff Pritchett, at trial that her department, as a pattern of practice, does not make inquiry regarding whether a child taken into CNO custody may be eligible for enrollment in any other federally recognized Indian tribe.

10

33.     Section 60.5 of the CNO Code provides that the CNO must consent to any placement or adoption of a minor child over which it exercises custody. 10 CNCA § 60.5 (emphasis added). In other words, the CNO has an absolute "veto power" with regard to the temporary or permanent placement of any minor child caught in its Indian Child Welfare system, regardless of whether CNO is the Indian child's tribe as defined by ICWA.

34.     The Temporary Automatic Citizenship Ordinance and Section 60.5 of the CNO Code permit the CNO to create jurisdictional facts which otherwise would not exist.

## B.     The CNO captures custody of a Keetoowah Child

35.     On or about October 6, 2016, K.P., the minor child who is the subject of these proceedings (referred to herein as the "Minor Child") was born to a drug-addled mother and mentally-handicapped father at Hastings.

36.     The CNO Attorney General initiated a juvenile deprived proceeding in the CNO District Court. Case No. JD-2016-23 (referred to herein as the "Juvenile Deprived Proceeding").

37.     CNO ICW obtained custody of the Minor Child on or about October 10, 2016 by Order of the CNO District Court.

38.     Despite the shortcomings of his parents, the Minor Child also derives from a large, culturally rich, full-blood, extended Keetoowah family who are actively involved in the Keetoowah cultural community and practice the unique culture and traditions of the Keetoowah people.

39.     Upon information and belief, the Minor Child is in fact almost a full-blood Indian. The natural father of the Minor Child, paternal grandmother and many extended

11

family members of the Minor Child are enrolled members of UKB. Due to the Minor Child's strong blood, familial, and cultural connections to the Keetoowahs, the UKB is the Indian child's tribe as defined by ICWA.

40.     Nevertheless, upon information and belief, CNO enrolled the Minor Child in the CNO by operation of Temporary Automatic Citizenship Ordinance without regard to the wishes of the Minor Child's biological family, most of whom are enrolled members of UKB. The natural father attempted to repudiate such tribal enrollment without success.

41.     It is clear from the record and no one disputes that CNO did <u>not</u> notify the UKB of the Juvenile Deprived Proceeding of the proceeding.

42.     Pritchett, as the biological aunt of the Minor Child, is entitled to preferential consideration as a potential custodian of the Minor Child under tribal and federal law. *See* 10 CNCA § 40.6 (incorporating the federal Indian Child Welfare Act placement preferences). *See also* 10 CNCA §§ 1, 21.1, 1135, 1135.1 and 1136. CNO law mandates that "custody should be awarded in the following order of preference according to the best interests of the child to: 1. A parent; 2. A grandparent . . . 4. A relative of either parent . . . ." 10 CNCA § 21.1.

43.     Cherokee ICW initially placed the Minor Child with Pritchett, as a kinship foster parent, where he remained for a significant period of time. The reports filed of record in the Juvenile Deprived Proceeding by the Court-Appointed Special Advocate ("CASA") indicated that the Minor Child was thriving in his placement with Family Members and that he was "well-loved" by them, his paternal grandparents and other extended family members.

44.     Plaintiff Pritchett and her husband are a married couple; they are not felons or sex offenders; they are gainfully employed; they have safe and suitable housing; they are not insolvent; they have no record of child abuse or neglect or domestic violence. Indeed, they passed the hyper-technical CNO ICW placement criteria in the first instance. At trial, Pritchett produced a certified home study provider who testified that Pritchett and her husband were suitable and financially sound in all respects. The CASA Worker testified at trial that Pritchett has a safe and loving home, as she had repeatedly noted in her regular reports to the Court.

45.     Following a verbal disagreement between Pritchett and a newly appointed CNO ICW worker, CNO removed the Minor Child from Pritchett's home and placed the Minor Child in a foster home with no connection to the biological family of the Minor Child or the UKB. Upon information and belief, the foster parents possessed a negligible quantum of Indian blood as compared to the Minor Child, are not identifiably Indian, and are not actively involved in the Keetoowah or Cherokee cultural community.

46.     Neither CNO ICW nor the CNO court furnished Plaintiffs with any notice or opportunity to challenge the change in placement. The CASA Worker objected to the change in placement and filed a report to this effect in February 2018 with Barteaux.

## C.     The United Keetoowah Band Attempts to Intervene in the Juvenile Deprived Case

47.     UKB officials became aware of the Juvenile Deprived Proceeding anecdotally and immediately undertook efforts to participate formally in the case.

48.     The UKB confirmed with its enrollment office that the Minor Child was eligible for membership in the UKB, and, later, issued a certificate of degree of Indian blood and indicia of tribal membership to the Minor Child pursuant to its own tribal law, which recognizes the automatic temporary membership of any minor child under the age of five (5).

49.     The UKB, by and through its Attorney General, filed a Motion to Intervene as a Non-Party in the Juvenile Deprived Proceeding on or about May 2, 2018. The UKB Attorney General entered his formal appearance in the Juvenile Deprived Proceeding and requested notice of all future proceedings involving the Minor Child to be directed to his law office in Oklahoma City. The UKB Attorney General appended to his Intervention Motion documents evidencing the Indian heritage of the Minor Child and the UKB's position that the Minor Child is eligible for membership in the UKB.

## D.    CNO Rejects the UKB's Efforts to Intervene and Retaliates Against UKB

50.     The CNO did not welcome the efforts of UKB to participate in the Juvenile Deprived Proceeding and continued to erect various barriers to UKB involvement. The tension between the CNO and UKB culminated in the entry by Barteaux, sua sponte, of an Order—known as the "Gag Order"—on May 11, 2018. The Gag Order held that, "by appearing and intervening in this matter the UKB . . . willingly placed their selves [sic.] under the authority of the Cherokee Nation Court System including but not limited to the Court's contempt power" (emphasis added).

51.     The Gag Order purported to hale certain UKB officials and the UKB Attorney General back to the CNO District Court to be tried for contempt. The Order instructed that those named UKB officials "shall be prepared to present why they should not be held in contempt of Court, sanctioned and or fined . . ." Barteaux further ordered that "the previously entered order allowing UKB to intervene filed herein on May 11, 2018 is hereby vacated in total. UKB, UKB representatives or agents, and or UKB counsel shall not have access to any CNO District Court files that Judge Barteaux has authority over, including but not limited to this case."

52.     The CNO did not provide the UKB with any official information or formal notices regarding the Minor Child, or any other Keetoowah child. UKB Indian Child Welfare workers nevertheless faithfully continued to acquire such information through family members of the Minor Child and other back channels and attempted to appear for court proceedings where they would be forced to remain in the hallways and would not be allowed to participate.

53.     By virtue of the Gag Order, the UKB officials and authorities were "chilled" in their efforts to protect the Minor Child. The family members of the Minor Child testified at trial that they felt they could not seek relief from the UKB government or communicate with anyone—including legal counsel—about the Juvenile Deprived Proceeding due to the chilling effect of the Gag Order.

## E.     CNO Solidifies Its Claim to the Keetoowah Child

54.     Throughout the pendency of the underlying Juvenile Deprived Proceeding, Pritchett and other extended family members of the Minor Child hoped and believed that

the natural father of the Minor Child would complete his individual service plan and correct the conditions resulting in the Juvenile Deprived Proceeding. However, sufficient progress apparently was not made by natural father and CNO moved to terminate his parental rights.

55.    Undersigned counsel for Plaintiff Pritchett is informed and believes that natural father did not receive court-appointed counsel until the eve of the jury trial convened to determine whether his parental rights would be terminated. Further, it is the understanding of the undersigned counsel for Plaintiff Pritchett that his court-appointed attorney expressed concern regarding natural father's mental cognition and ability to participate in his defense.

56.    On or about November 9, 2018, following the jury trial, Natural Father's parental rights were in fact terminated. At that point in time, the Minor Child was released for third-party adoption as a matter of law.

## F.    The Minor Child's Family Members Seek Relief

57.    Pritchett and her husband subsequently engaged a private attorney who filed a Motion to Intervene in the Juvenile Deprived Proceeding and to Request Permission to Pursue the Adoption of the Minor Child on or about December 20, 2018. The paternal grandparents of the Minor Child filed a separate proceeding seeking grandparental visitation with the Minor Child as authorized by the CNO Code. *See* Cherokee Nation Case No. CV-19-154; Supreme Court Case No. SC-19-05.

58.    The natural father subsequently executed a written consent to the proposed adoption of the Minor Child by Pritchett and her husband, which is filed of record in the

Juvenile Deprived Proceeding. The natural father also evidenced his consent to the grandparental visitation petition.

59.    Pritchett also caused to be filed two separate Motions to Disqualify Trisha Archer (herein referred to as "Archer"), the court-appointed attorney for the Minor Child, based on irreconcilable conflicts of interest. Archer had indicated to Pritchett's counsel that she also had been retained by the current foster parents to pursue an adoption of the Minor Child on their behalf. Despite this conflict, Archer, as the court-appointed attorney for the child, continued to take litigation positions in the Juvenile Deprived Proceeding, which advanced the interests of the adoptive foster parents and disfavored the Minor Child's biological family members and the UKB. Upon information and belief, CNO allows attorneys to represent both the child and the potential adoptive parents in cases such as this.

60.    Archer filed pleadings in the Juvenile Deprived Case in opposition to the claims of the Minor Child's biological family members but filed no written response to either conflict motion directed at her own conduct in the case.

61.    Like many court-appointed lawyers in the CNO District Court system, Archer is non-Indian.

62.    Barteaux dismissed the two motions intended to disqualify Archer (without explanation) and permitted Archer to participate in the trial, to examine witnesses and to opine regarding the best interests of the Minor Child.

63.    The CNO and Archer adamantly opposed the requests for consideration of permanent placement and grandparental visitation by the biological family members of the

Minor Child, and steadfastly withheld its consent in favor of the placement with non-UKB members as permitted by Section 60.5 of the CNO Code.

64.    The CNO District Court is a tribal court, ostensibly intended to employ a more flexible world view with sensitivity to the unique culture of the Cherokee people. Nevertheless, Barteaux appeared to be compelled by the introduction into evidence of outstanding traffic warrants of Pritchett's mother from the 1980's and the fact that Pritchett's father had received a municipal citation for an overgrown lawn. CNO authorities took the almost nonsensical position that, if the grandmother were stopped and arrested for the old traffic warrant, the Minor Child could be taken into custody and endangered. Barteaux apparently was not convinced by the testimony of a certified adoption home study provider who testified that Pritchett and her husband were suitable placements by all standards and metrics.

65.    On or about February 27, 2019, Barteaux entered judgment in favor of the CNO and denied Pritchett's request to pursue adoption of the Minor Child as well as the petition for grandparental visitation (referred to herein as the February 27, 2019 Order).

66.    The Court in its February 27, 2019 Order also found that the Minor Child is not Keetoowah, based on the supposed absence of records reflecting the Indian heritage of the natural mother of the Minor Child, even though the Attorney General of the Band appended such records to the UKB's Motion to Intervene filed in May of 2018.

67.    Upon hearing, Barteaux issued an Order prohibiting Pritchett from pursuing the adoption case in part due to Section 60.5 of the CNO Code. Barteaux refused to address Pritchett's motion to disqualify Archer based on lack of standing of Pritchett.

### G.    Plaintiffs Exhaust Tribal Remedies

68.    Pritchett and the biological grandparents of the Minor Child timely appealed the February 27, 2019 Order to the CNO Supreme Court.

69.    In the appeal, Pritchett urged the CNO Supreme Court to consider, inter alia, whether the United Keetoowah Band should have been notified and permitted to participate at every juncture of the proceedings and whether the juvenile deprived proceeding was so permeated with conflicts of interest and irregularities that it amounted to a denial of basic fairness and fundamental due process.

70.    On or about October 28, 2019, the Cherokee Nation Supreme Court entered an Opinion and Order with respect to the appeal commenced by Pritchett (referred to herein as the "October 28, 2019 Order"). The Order provided in relevant part as follows:

> Other issues permeated these proceedings. First, the minor child may be eligible for membership in <u>the United Keetoowah Band, a federally recognized Indian Tribe who was not properly provided notice of these proceedings</u>, a situation required by CN statutes. 10 CNCA § 40 (3) states in part:
>
> ". . . In any Indian child custody proceeding under the Cherokee Nation Indian Child Welfare Act the Court or party initiating the action, if it is a private action, shall send notice to the parents or to the Indian custodian, if any, and to the tribe that may be the tribe of the Indian child by registered mail return receipt requested . . ."
>
> That statutory notice requirement was not followed, and the District Court should review how this matter was overlooked to determine if the rights of the minor child were abridged. <u>Providing UKB with notice is a critical element of due process and benefits all parties to ensure that it is properly administered</u>.

*Id.* (emphases added).

19

71.    The Order further instructed that, "claims asserted on appeal that counsel for the petitioner [i.e., Archer] may have acted improperly should be reviewed and clarified deserve further review and explanation."

72.    The Cherokee Nation Supreme Court did not address the grandparental visitation claim in the October 28, 2019 Order.

73.    Barteaux failed to effectively or meaningfully implement the October 28, 2019 Order.

74.    The certificate of service appended to the October 28, 2019 Order reflects that notice of the decision was transmitted by electronic mail to Pritchett's counsel of record and to the CNO Assistant Attorney General. Notice of the October 28, 2019 Order was not provided to the UKB Attorney General.

75.    Upon information and belief, the CNO provided no notice to the UKB Attorney General of the CNO Supreme Court order of October 28, 2019 Order or any subsequent proceeding involving the Minor Child, even though he had entered a formal appearance in the Juvenile Deprived Proceeding.

76.    The notice provided by CNO to UKB Indian Child Welfare authorities subsequent to the October 28, 2019 Order, if any, was against the backdrop of prior proceedings where UKB representatives were not allowed to enter the courtroom and instead forced to remain waiting in the hallway. And, again, no notice was provided to the UKB Attorney General, who had notified the CNO District Court during the initial Motion to Intervene hearing that he represented the UKB in this matter and who had entered an

appearance in the proceedings and had appeared at two hearings in the case before being barred from participating.

77.    Again, the UKB learned anecdotally of the CNO Supreme Court's October 28, 2019 Order. After learning of the order, the UKB, by and through its Attorney General filed a second Motion to Intervene in the Juvenile Deprived Proceeding on or about December 5, 2019 (referred to herein as the "Second Intervention Motion").

78.    At that point, Barteaux directed that the UKB Attorney General receive a copy of the court file. However, the UKB Attorney General received the court file only for the Juvenile Deprived Proceeding, which made no mention of an adoption proceeding that apparently had been recently filed in a separately numbered case. The CNO District Court provided no notice of the adoption proceeding to the UKB Attorney General, who, again, had entered an appearance in the juvenile proceedings and had appeared at two hearings in that case. The CNO court was, therefore, on notice the UKB Attorney General represented the UKB, as the Indian child's tribe under 25 U.S.C. § 1903(5)(b), which had a strong interest in ensuring the Minor Child would be placed with extended family members within the UKB, as authorized by ICWA. 25 U.S.C. § 1915(b). Yet, the CNO court made no effort to notify the UKB Attorney General of the CNO Supreme Court decision or of the adoption proceeding. The Juvenile Deprived Proceeding court file reflected only that the juvenile matter was set for a "review hearing" in March 2020.

79.    Barteaux scheduled the Tribe's Second Intervention Motion and a review hearing to be heard on December 19, 2019. Upon arriving at the hearing, Barteaux informed the UKB Attorney General that he had issued a Final Decree of Adoption of the Minor

Child in a separately filed adoption proceeding several days before the hearing on the Second Intervention Motion, without providing any prior notice of adoption proceeding to the UKB Attorney General. The Final Decree of Adoption apparently was issued on a date other than a regularly scheduled hearing date, upon information and belief, Monday, December 16, 2019, only a short time after the adoption proceeding was initiated. Because the Final Decree of Adoption had already been entered, Barteaux closed the juvenile matter at, or shortly after, the December 19, 2019 hearing.

80.    Undersigned counsel remain confounded by the procedural irregularities in this case, such as the scheduling of a "review hearing" of the Juvenile Deprived Proceeding in March of 2020 despite the apparent pendency of a final decree of adoption. It appears to smack of an effort to mislead the UKB and to undermine the participation of the UKB in these matters, despite the issuance of the October 28, 2019 by the Cherokee Supreme Court.

81.    Further, it is unclear whether Barteaux ever "reviewed and clarified" his position with respect to Archer, as instructed by the CNO Supreme Court in the October 28, 2019 Order.

82.    The CNO Supreme Court was the last avenue of redress available to Plaintiffs through a tribal forum. Further, the Plaintiffs were not parties to the adoption proceeding and were given no notice of the adoption before the Final Decree of Adoption was entered. Therefore, Plaintiffs have fully exhausted all tribal remedies available to them.

83.    The UKB is a separate and distinct federally recognized Indian tribe imbued with governmental privileges and immunities; therefore, the UKB possessed no tribal

remedies requiring exhaustion with respect to the February 27, 2019 Order issued in excess of the CNO District Court's jurisdiction.

84.    Moreover, Barteaux's failure to implement meaningfully the October 28, 2019 Order indicates that even if the UKB had possessed and was required to invoke any such remedy, it would have been futile. Further, because the Plaintiffs were not parties to the adoption proceeding, any further exhaustion in that matter would have been impossible and futile. Similarly, any further appeals of the juvenile proceedings were rendered futile when Barteaux entered the Final Adoption Decree in the adoption proceeding and closed the juvenile proceeding.

85.    As the CNO courts lack jurisdiction over the UKB and the Minor Child, any attempted tribal exhaustion would, in any event, have served no purpose other than delay.

## H.    The CNO Court not federally recognized

86.    As currently constituted, the CNO courts are not federally recognized. The CNO District Court and Supreme Court were created by a CNO tribal constitution drafted in 1999 and allegedly approved by CNO citizens in 2003. CNO Const. art. VIII (1999). However, the federal government has never approved the enactment of this Constitution as required by federal law and by the 1976 CNO Constitution. "No amendment or new Constitution shall become effective without the approval of the President of the United States or his authorized representative." CNO Const. art. XV § 10 (1976). Upon information and belief, the alleged 1999 CNO Constitution has never been approved by the President of the United States or his authorized representative. Exhaustion of remedies in such unrecognized tribal courts, therefore, is futile and would serve no purpose other than delay.

23

### First Cause of Action
### Application for Writ of Habeas Corpus

87.    Plaintiffs reallege and incorporate by reference all prior Paragraphs of this Complaint.

88.    The foregoing irregularities amount to a fundamental denial of due process for the Minor Child and for the Indian child's tribe (the UKB), and for the Minor Child's extended family member (Pritchett), with whom the UKB wishes the Minor Child to be placed under 25 U.S.C. § 1915(b).

89.    The UKB, as the Indian child's tribe, has the right to specify the home in which the Minor Child is placed, 25 U.S.C. § 1915(b)(ii), and generally to represent the interests of its children, parents, and tribal citizens. Here, the UKB has a right to represent the interests of the Minor Child as the Indian child's tribe under the Indian Child Welfare Act and both its rights and the rights of the Minor Child and extended family member who have been directly, personally, and substantially injured by the actions of Barteaux. The UKB is the guardian of the health, safety, and property of its tribal members. The UKB, on behalf of itself, its citizens, parents, and children is directly aggrieved by the actions complained of herein.

90.    It is clear the United States Supreme Court regards parental rights as a fundamental liberty interest, which is protected by the Due Process Clause of the Fifth Amendment to the Constitution. *See*, *generally*, *Santosky v. Kramer*, 455 U.S. 745 (1982). Courts also have extended these due process protections to guardians, "Indian custodians," and other "Parens Patriae." *See Smith v. Organization of Foster Families*, 431 U.S. 816 (1977). See also, Matter of P.C., 842 P.2d 364 (Okla. App. 1992).

24

91.     The United States has a deeply rooted tradition of honoring intimate family relationships. Plaintiff Pritchett possess a fundamental right of liberty to intimate familial relationships as the biological aunt, former foster mother and prospective adoptive parent of the Minor Child, and as the extended family member and placement preference of the Indian child's tribe under the Indian Child Welfare Act. 25 U.S.C. § 1915(b).

92.     The intimate familial relationship between a prospective adoptive parent and a child is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest. The CNO has no adequate justification for abrogating or severing an intimate familial relationship between a child and prospective adoptive parents in favor of placement with non-relatives, and there is none. The CNO has violated the substantive due process rights under the Fifth Amendment of Pritchett as the biological aunt, former foster mother and prospective adoptive parent of the Minor Child, and the rights of that Indian child. The CNO has also violated the rights of the UKB to be informed of and to participate in the Juvenile Deprived Proceeding for the Minor Child whose family is UKB and who is eligible for membership in the UKB.

93.     To the extent that CNO ICW, a mere agency and custodial entity, purports to wield the unilateral authority to override the discretion of the District Court Judge regarding placement decisions and other matters bearing on the best interests of Cherokee Children, such power amounts to a fundamental denial of due process protections. *See* 10 CNCA §§ 60.5, 60.6.

94.    Under the ICRA, federally recognized Indian Tribes may not abridge these fundamental rights as a matter of federal law. See, 25 U.S.C. § 1302 (a)(8). Section 1302 of ICRA prohibits an Indian tribe from denying any person within its jurisdiction the equal protection of its laws, or to deprive any person of liberty or property without due process of law.

95.    The ICRA further guarantees that "[t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." *See* 25 U.S.C. § 1303.

96.    The CNO has secreted the Minor Child away from the UKB and his biological family members, including Pritchett, without due process of law.

97.    The Minor Child is unlawfully detained by CNO in derogation of: (a) his rights under the Indian Child Welfare Act to be placed with a member of his extend family, 25 U.S.C. § 1915(b)(i) and to be placed with a foster home specified by the UKB (the Indian child's tribe), 25 U.S.C. § 1915(b)(ii); (b) the rights of the UKB, the Indian child's tribe under 25 U.S.C. § 1903(5)(b), which has specified placement with Pritchett as the Minor Child's extended family member under 25 U.S.C. § 1915(b)(i) and as parens patriae; and (c) the rights of Pritchett as next friend and extended family member of the Minor Child, who the Indian child's tribe has selected for placement under 25 U.S.C. § 1915(b).

98.    Barteaux's foregoing actions mandate habeas review under the ICRA.

99.    Plaintiffs, and each of them, are entitled to issuance of a writ of habeas corpus for the Minor Child under the ICRA.

100.    This is a wrong capable of repetition because other UKB children presently are detained unlawfully by CNO, without notice to the UKB.

101.    Accordingly, a writ of habeas corpus should be issued, and the February 27, 2019 Order and any purported decree of adoption should be set aside and vacated.

## Second Cause of Action
## Declaratory Judgment and Injunctive Relief

102.    Plaintiffs reallege and incorporate by reference all previous paragraphs of this Complaint.

103.    Plaintiffs bring this claim for declaratory judgment under 28 U.S.C. §§ 2201-02 and Fed. R. Civ. P. 57 and for injunctive relief. A dispute has arisen between Plaintiffs and Defendant over the jurisdiction of the Cherokee Nation courts with respect to Keetoowah children. Such dispute constitutes a judiciable controversy between the parties.

104.    The UKB is a separate and distinct federally recognized Tribe. The UKB is not subject to the jurisdiction of the CNO District Court. Tribal courts are not courts of general jurisdiction, and a tribe's inherent adjudicative jurisdiction over nonmembers is, at most, only as broad as its legislative jurisdiction. The CNO District Court was created by the non-federally approved 1999 CNO Constitution and lacks any jurisdiction as a matter of federal law. The Cherokee Nation District Court, therefore, does not have jurisdiction over the UKB or the Minor Child.

105.    The Cherokee Nation District Court did not have the jurisdiction or power to take custody of the Minor Child. Judge Barteaux acted outside of the scope of his authority. The UKB cannot remedy these injuries through its sovereign lawmaking powers due to the

unlawful usurpation of jurisdiction by Barteaux. The defects and irregularities complained of herein are jurisdictional such that any Order purportedly issued by Barteaux is void.

106.    Barteaux foreclosed every opportunity of Pritchett and the UKB to participate in the life of the Minor Child in the face of Cherokee codified law and public policy that mandates the continuation of such relationships and cultural heritage when possible. The Minor Child has not been abandoned by his relatives or his tribe of origin. They have pursued every avenue to remain in his life, including the avenue of this appeal. They now look to this Court to vindicate their fundamental rights.

107.    The Minor Child is entitled to the love and affection of his biological family members vis-à-vis foster parents or any other third party and he is entitled to receive their cultural teachings and traditions. Indeed, the Minor Child is loved and wanted by his entire tribe, the United Keetoowah Band of Cherokee Indians. The UKB is entitled to specify preferences for the placement of the Minor Child as the Indian child's tribe under the ICWA. Plaintiffs are entitled to the benefit of every doubt such that these relationships and cultural connections may be preserved.

108.    For the reasons stated above, Plaintiffs request the Court to enter judgment declaring that the CNO courts do not have jurisdiction over the UKB or the Minor Child and enjoining the jurisdiction of such courts over the UKB or Minor Child.

109.    This Court is imbued with the authority to award the requested declaratory and injunctive relief, 28 U.S.C. §§ 2201-02, and costs and attorneys' fees. 28 U.S.C. § 2412.

110.    Plaintiffs further request the Court enter judgment declaring the February 27, 2019 Order null and void and setting aside and vacating any purported final decree of adoption with respect to the Minor Child.

111.    Plaintiffs request a declaratory order that the UKB is the Indian child's tribe under the ICWA.

112.    Plaintiffs also request a declaratory order that the CNO violated the rights of the UKB under the ICWA by failing to give notice to of the Juvenile Deprived Proceeding to the UKB Indian Child Welfare Department and by failing to give notice to the UKB Attorney General of the adoption proceedings or the CNO Supreme Court Order in the Juvenile Deprived Proceeding and wrongfully denied the UKB the ability to take part in the juvenile and adoption proceedings as required by ICWA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

(a)    Issue the requested writ of habeas corpus or, to the extent necessary, order Defendant to show cause immediately why the writ should not issue and to answer the allegations contained herein;

(b)    To the extent necessary, permit Plaintiffs to conduct discovery and submit written briefs in advance of any evidentiary hearing concerning this Amended Complaint;

(c)    Declare that Defendant's acts of secreting and detaining the Minor Child away from the UKB and his biological family members, including Pritchett,

represent a sufficiently severe potential or actual restraint on liberty interests as to warrant habeas review;

(d)     Order Defendant to discharge the Minor Child from unlawful detention and restraint;

(e)     Declare that the CNO courts do not have jurisdiction over the UKB and the Minor Child; and did not have jurisdiction to secret the Minor Child to the exclusion of the UKB or to enter the February 27, 2019 Order, and enjoin Defendant from exercising any jurisdiction over the UKB or the Minor Child;

(f)     Issue an Order vacating the February 27, 2019 Order and setting aside any purported Decree of Adoption of the Minor Child;

(g)     Declare that the UKB is the Indian child's tribe under the ICWA;

(h)     Declare that the CNO violated the rights of the UKB under the ICWA by failing to give notice to the UKB Attorney General of the adoption proceedings and of the CNO Supreme Court Order in the Juvenile Deprived Proceeding and wrongfully denied the UKB the ability to take part in the juvenile and adoption proceedings as required by ICWA;

(i)     Award attorneys' fees and costs incurred by Plaintiffs in bringing this action; and

(j)     Grant such other and further relief as this Court may deem proper and just. Without such relief, the CNO would be unanswerable and unaccountable for its actions.

Respectfully Submitted,


/s/ Klint A. Cowan
Klint A. Cowan, OBA No. 20187
FELLERS SNIDER
100 N. Broadway, Suite 1700
Oklahoma City, OK  73102
Telephone: (405) 232-0621
Facsimile: (405) 232-9659
Email: KCowan@FellersSnider.com
**Attorney for Plaintiff United Keetoowah Band of Cherokee Indians in Oklahoma**

-and-

Amanda S. Proctor, OBA No. 21033
SHIELD LAW GROUP, PLLC
300 Riverwalk Terrace, Suite 200
Jenks, OK  74037
Telephone: (800) 655-4820
Facsimile: (800) 619-2107
Email: aproctor@shield-lawgroup.com
**Attorney for Plaintiff Kelly Pritchett Evan**


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2020, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

/s/ Klint A. Cowan

80729/839940.4