**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE UNITED KEETOOWAH BAND OF CHEROKEE INDIANS IN OKLAHOMA, a federally recognized Indian tribe as parens patriae for K.P., and KELLY PRITCHETT EVAN, an individual and next friend of K.P., | |
| Plaintiffs, | |
| v. | Case No. 20-CV-8-GKF-JFJ |
| T. LUKE BARTEAUX, Presiding District Judge for the District Court of the Cherokee Nation of Oklahoma, a federally recognized Indian tribe, | |
| Defendant. | |

**OPINION AND ORDER**

Before the court is the Motion to Dismiss [Doc. 23] of defendant T. Luke Barteaux, as Presiding District Judge for the District Court of the Cherokee Nation of Oklahoma. For the reasons set forth below, the motion is granted.

**I. The Allegations and the Tribal Court Proceedings[1]**

On October 6, 2016, a woman testing positive for amphetamines gave birth to a child, K.P., at the Cherokee Nation's Hastings Medical Center in Tahlequah, Oklahoma. The Cherokee Nation obtained emergency custody of K.P. soon after birth because of the mother's positive amphetamine test and her admission to methamphetamine use during pregnancy. [Doc. 20, p. 11, ¶¶ 35-37; Doc. 25-1, pp. 2-5]. In April 2017, the Nation's Indian Child Welfare Department (ICW) placed K.P. in

---

[1]   The court considers only the allegations in the Amended Complaint and the tribal court documents in the Juvenile Deprived and Adoption Proceedings that have been filed with the briefing on this motion.

foster care with plaintiff Kelly Pritchett Evan, K.P.'s paternal aunt.  [Doc. 20, p. 12, ¶ 43; Doc. 25-1, p. 34, ¶¶ 7, 9].  Ms. Pritchett, like many of K.P.'s paternal relatives, is an enrolled member of plaintiff The United Keetoowah Band of Cherokee Indians in Oklahoma (UKB).  [Doc. 20, p. 7, ¶ 18; *Id.*, p. 11-12, ¶ 39].  However, following a verbal disagreement between Pritchett and a Cherokee Nation child welfare worker, the Cherokee Nation's ICW removed K.P. from Pritchett's home and placed him in a new foster home with no biological connection to K.P.  [Doc. 20, p. 13, ¶ 45].  K.P. continued in the Nation's custody for over three years until he was adopted by members of the Cherokee Nation on December 16, 2019.  [Doc. 20, pp. 21-22, ¶ 79; Doc. 25-1, pp. 64-68].

Plaintiffs seek review of the Cherokee Nation's tribal court juvenile proceedings—the Juvenile Deprived Proceeding, Case No. JD-16-23, and the Adoption Proceeding, Case No. A-19-53—which culminated in K.P.'s adoption.  In May 2018, the UKB's Attorney General filed a motion to intervene in the Juvenile Deprived Proceeding.  [Doc. 20, p. 14, ¶ 49; Doc. 25-1, p. 12].  Judge Barteaux granted the motion in an Order filed on May 11, 2018 at 10:17 a.m., and found "[t]he UKB has an interest in the placement of minor child, K.P., who is eligible for enrollment in the UKB and whose family is enrolled UKB."  [Doc. 25-1, p. 12, ¶ 1; *see also* Doc. 20, p. 14, ¶ 48].  The UKB's Attorney General entered a formal appearance and requested notice of all future proceedings involving the minor child to be directed to his law office in Oklahoma City.  [Doc. 20, p. 14, ¶ 49].  But at 3:53 p.m., following a closed hearing during which the UKB's Assistant Chief listened in through the main door to the courtroom and during which hearing Judge Barteaux learned that newspaper articles regarding K.P. had been published, Judge Barteaux entered an Order vacating the Order he had entered earlier that day.  He ordered that the "UKB, UKB representatives or agents, and or UKB counsel shall not have access to any CNO District Court files that Judge Barteaux has authority over, including but not limited to this case, until further

Order of the Court." [Doc. 20, p. 15, ¶ 51; Doc. 25-1, p. 15, ¶ 9]. Plaintiffs allege that "[b]y virtue of the [second Order of May 11, 2018], the UKB officials and authorities were chilled in their efforts to protect the Minor Child" and K.P.'s family members "felt they could not seek relief from the UKB government or communicate with anyone—including legal counsel—about the Juvenile Deprived Proceeding due to the chilling effect of the [second Order of May 11, 2018]." [Doc. 20, p. 15, ¶ 53].

Plaintiff Pritchett and K.P.'s other family members nonetheless "hoped and believed that the natural father of the Minor Child would complete his individual service plan and correct the conditions resulting in the Juvenile Deprived Proceeding. However, "sufficient progress apparently was not made by natural father" and the Cherokee Nation moved to terminate his parental rights. [*Id.*, pp. 15-16, ¶ 54]. On November 9, 2018, following a jury trial, Judge Barteaux terminated the natural father's parental rights. [*Id.*, p. 16, ¶ 56; Doc. 25-1, pp. 26-28]. The jury found that the natural father had been given three months to correct the conditions which led to the deprivation of the child, but had failed to correct the conditions, and that termination of parental rights was in the best interests of the child. [Doc. 25-1, p. 28, ¶ 1]. In his Order, Judge Barteaux found "[t]he Cherokee Nation has provided active efforts to reunite the family but the natural father failed to comply with the Court-ordered treatment plan and failed to correct the conditions which led to the child's deprivation." [Doc. 25-1, p. 27, ¶ 9]. Those conditions included the use of methamphetamine. [*Id.*, ¶ 5].

Pritchett and her husband subsequently engaged a private attorney to file a Motion to Intervene in the Juvenile Deprived Proceeding and to Request Permission to Pursue the Adoption of the Minor Child. [Doc. 20, p. 16, ¶ 57]. However, the Cherokee Nation and K.P.'s court-appointed attorney opposed permanent placement with Pritchett in favor of placement with non-

UKB members.  [*Id.*, pp. 17-18, ¶ 63].  Plaintiffs allege that K.P.'s court-appointed attorney "had indicated to Pritchett's counsel that she also had been retained by the current foster parents to pursue an adoption of [K.P.] on their behalf" and "continued to take litigation positions . . . which advanced the interests of the adoptive foster parents and disfavored [K.P.'s] biological family members and the UKB."  [*Id.*, p. 17, ¶ 59].  Pritchett filed two separate Motions to Disqualify K.P.'s court-appointed attorney for irreconcilable conflicts of interest.  [*Id.*].

In an Order entered February 27, 2019, Judge Barteaux denied the Pritchetts' request to intervene and pursue adoption of K.P.  [Doc. 20, p. 18, ¶ 65; Doc. 25-1, p. 47].  He also denied the motions to disqualify K.P.'s court-appointed attorney, concluding the Pritchetts lacked standing to raise the issue.  [*Id.*, ¶ 62; Doc. 25-1, pp. 47-48].  He noted Pritchett and her husband had placement of the child from April of 2017 until January of 2018, roughly nine months.  [Doc. 25-1, p. 34, ¶ 9].  Then, "[a]t the request of [Pritchett and her husband] the child was removed from their home and the child was placed in [another] foster home."  [*Id.*, p. 35, ¶ 11].  Judge Barteaux found the Cherokee Nation had just cause to remove K.P. from the Pritchetts' home where the Pritchetts "voluntarily requested the child be removed, were given a chance to change their minds, and they refused to do so."  [*Id.*, p. 45].  He concluded the Pritchetts lacked any mandatory or conditional intervention right "because they never gained a liberty interest in the child."  [*Id.*].  He also wrote that "it would also appear the child is not UKB eligible" because the Cherokee Nation had not consented to relinquish the child's Cherokee Nation citizenship.  [*Id.*, p. 50; Doc. 20, p. 18, ¶ 66].  With respect to the UKB's intervention in the Juvenile Deprived Proceeding, Judge Barteaux wrote that, until such time as the Juvenile Deprived Proceeding is closed, "the Court's order stands that all UKB has to do to continue to intervene is to just show up and abide by the Court's orders just as they are required to do in any other tribal, state, or federal court system."  [Doc. 25-1, p. 51].

The Pritchetts timely appealed Judge Barteaux's Order to the Cherokee Nation's Supreme Court.  [Doc. 20, p. 19, ¶ 68].  On October 28, 2019, the Supreme Court upheld the termination of the natural father's parental rights but recommended "[c]laims asserted on appeal that counsel for the [current foster parents] may have acted improperly should be reviewed and clarified."  [*Id.*, p. 20, ¶ 71; Doc. 25-1, p. 55].  The Supreme Court identified "[o]ther issues [that] permeated these proceedings."  First, it stated that K.P. "may be eligible for membership of the United Keetoowah Band, a federally recognized Indian tribe who was not properly provided notice of the proceedings, a situation required by [Cherokee Nation] statutes."  [Doc. 25-1, p. 55].  Second, it stated "[t]hat [the] statutory notice requirement was not followed, and the District Court should review how this matter was overlooked to determine if the rights of the minor child were abridged."  [*Id.*, p. 56].  The Supreme Court concluded with the following admonition: "[p]roviding UKB with notice is a critical element of due process and benefits all parties to ensure that it is properly administered."  [*Id.*, p. 56].  Plaintiffs here allege that Judge Barteaux "failed to effectively or meaningfully implement the [Cherokee Nation Supreme Court's] Order."  [Doc. 20, p. 20, ¶ 73].

Plaintiffs also contend that the Cherokee Nation provided no notice to the UKB's Attorney General of the Supreme Court's order or any subsequent proceeding involving K.P., even though the Attorney General had entered a formal appearance in the Juvenile Deprived Proceeding.  [*Id.*, ¶ 75].  Two days after the Supreme Court's Opinion, Judge Barteaux entered the following "Additional Order Regarding UKB Intervention and Review":

> UKB having previously intervened in this matter and subsequently requested that they be given status updates in regards to the minor child, the court states as follows: UKB having intervened has access to the court file and is allowed to attend all proceedings involving the child. Further that all parties shall give notice to UKB of any future pleadings filed herein or in other cases, in accordance with Cherokee Nation statute. UKB is further given notice that there is currently a review hearing set in this matter on November 15, 2019

at 9:00 am. Unless otherwise requested by UKB the address that
pleadings are to be sent to is the same as listed in the Federal
Register which is as follows:

United Keetoowah Band of Cherokee Indians in Oklahoma
Raven Owl, ICW Advocate
P.O. Box 746
Tahlequah, OK 74465

It is so ordered.

[Doc. 25-1, p. 58]. The district court's records indicate that the order was mailed to the UKB's

designated agent for service of notice of proceedings under ICWA, but not to the UKB's Attorney

General, who had entered a formal appearance in the Juvenile Deprived Proceeding. [Doc. 20, p.

20, ¶ 75; Doc. 25-1, p. 58]. In the order memorializing a review hearing held in the Juvenile

Deprived Proceeding on November 15, 2019, Judge Barteaux found that the "UKB was given

notice of this hearing" but did not appear, and ordered that K.P. should remain in the Cherokee

Nation's temporary care, custody, and control. [Doc. 25-1, p. 60].[2]

Less than a week later, on November 21, 2019, a Petition for Adoption was filed with the

district court. [*Id.*, p. 85]. That same day, Judge Barteaux issued an "Order and Notice of Final

Decree Hearing," setting a hearing on the Final Adoption Decree for 10:00 am on the 16th day of

---

[2] Tribal court records reflect changing positions regarding the UKB's intervention in the Juvenile
Deprived Proceeding. As stated above, the tribal court granted the UKB's intervention on May
11, 2018, then vacated the order later that day. On June 1, 2018, the matter came on for a Contempt
Hearing at which the UKB's Attorney General appeared but "[n]o UKB parties appear[ed]." [Doc.
25-1, p. 80]. The defendant ordered that "[t]he Court will not allow UKB to intervene until said
parties appear before this Court." [*Id.*, p. 22]. However, on February 27, 2019, the defendant
wrote that "[u]ntil such time as the deprived case is closed the Court's order stands that all UKB
has to do is continue to intervene is to just show up and abide by the Court's orders just as they
are required to do in any other trial, state, or federal court system." [Doc. 25-1, p. 51]. On October
30, 2019, following the Cherokee Nation Supreme Court's Opinion, the defendant wrote in part:
"UKB having intervened has access to the court file and is allowed to attend all proceedings
involving the child. Further that all parties shall give notice to UKB of any further pleadings filed
herein or in other cases . . ." [*Id.*, p. 58]. It appears, however, the orders and notices were sent only
to the UKB's ICW Advocate, and not to the UKB's Attorney General who had entered a formal
appearance in the proceeding.

December 2019.  The Order and Notice appears to have been mailed to the UKB's designated agent for service of notice of proceedings under ICWA, but not to the UKB's Attorney General. The Order and Notice stated that "the court will hear evidence in support of and in opposition to the granting of the application" and "you will have the right to be present and an opportunity to be heard at said time and place including the right to object to the adoption of the children." [*Id.*, p. 62].

The UKB alleges it learned anecdotally of the Cherokee Nation Supreme Court's order of October 28, 2019 and filed a second Motion to Intervene in the Juvenile Deprived Proceeding on December 5, 2019.  [Doc. 20, p. 21, ¶ 77].  It alleges that, although Judge Barteaux directed that the UKB Attorney General receive a copy of the court file in the Juvenile Deprived Proceeding, the file contained no mention of the pending Adoption Proceeding.  [Doc. 20, p. 21, ¶ 78].  Judge Barteaux then set the UKB's second intervention motion in the Juvenile Deprived Proceeding for hearing on December 19, 2019.  [*Id.*, ¶ 79].  At that hearing, Judge Barteaux informed the UKB Attorney General that he had issued a Final Decree of Adoption three days earlier, on December 16, 2019.  [*Id.*; *see also* Doc. 25-1, pp. 64-68].  Because the Final Decree of Adoption had already been entered, Judge Barteaux closed the Juvenile Deprived Proceeding at, or shortly after, the December 19, 2019 hearing.  [Doc. 20, pp. 21-22, ¶ 79].

On these alleged facts, plaintiffs Pritchett and the UKB assert two causes of action.  The first is an application for Writ of Habeas Corpus under 25 U.S.C. § 1303.  [Doc. 20, p. 26, ¶ 95]. The second is for declaratory judgment under 28 U.S.C. §§ 2201-02 and Fed. Civ. P. 57 and for injunctive relief.  [*Id.*, p. 27, ¶ 103].

## II.  Legal Standard

Judge Barteaux moves to dismiss the first cause of action for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).  He moves to dismiss the second cause of action for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).  Rule 12(b)(1) "allows a court to dismiss a complaint for lack of subject matter jurisdiction."  *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015).  "Federal subject matter jurisdiction is elemental . . . and its presence must be established in every cause under review in the federal courts."  *Id.* (quoting *Firstenberg v. City of Santa Fe, N.M.*, 696 F.3d 1018, 1022 (10th Cir. 2012)).  "Indeed, it is to be presumed that a cause lies outside this [court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.* (quoting *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 770 F.3d 944, 947 (10th Cir. 2014)).  As for the motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*

## III.  Analysis

### A.  Habeas Relief

As previously mentioned, the first cause of action is an application for a writ of habeas corpus under § 1303 of the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301-04 (ICRA).  ICRA authorizes habeas petitions by "any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."  25 U.S.C. § 1303.  Plaintiffs contend habeas relief is appropriate because K.P. has been unlawfully detained by the Cherokee Nation in derogation of the Indian Child Welfare Act's placement provisions. [Doc. 20, p. 26, ¶ 97].  Judge Barteaux moves to dismiss on two grounds: first, that a writ of habeas corpus is not an available remedy to challenge

a tribal court child custody order under section 1303 of ICRA because a child is not considered "detained" in the child welfare context, and second, even if the writ is available, the claim fails because plaintiffs have not exhausted their tribal court remedies.

### 1. The "Detention" Requirement[3]

"Motions to dismiss under Rule 12(b)(1) may take one of two forms." *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 547 (10th Cir. 2001) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). "First, a party may make a facial challenge to the plaintiff's allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint. In addressing a facial attack, the district court must accept the allegations in the complaint as true." *Id.* "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. In addressing a factual attack, the court does not 'presume the truthfulness of the complaint's factual allegations,' but 'has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).'" *Id.* Although both parties have submitted factual affidavits, defendant's detention argument presents a facial challenge to the plaintiffs' allegations concerning subject matter jurisdiction. That is, defendant does not dispute the facts as presented by the plaintiffs, but rather argues the allegations are insufficient to show detention. Accordingly, the court accepts the allegations in the Amended Complaint as true. *Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 n. 1 (10th Cir. 2010) (In evaluating a facial attack to subject matter jurisdiction, the court applies "the same standards under Rule

---

[3] Judge Barteaux initially argues that plaintiffs' inability to show "detention" entitles him to sovereign immunity. But the defendant is not immune from suit based on tribal sovereign immunity, as he falls within the exception recognized in *Ex parte Young*, 209 U.S. 123 (1908). *Norton v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 862 F.3d 1236, 1251 (10th Cir. 2017) (citing *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154-55 (10th Cir. 2011)).

12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action.").

Federal habeas corpus relief under 25 U.S.C. § 1303 is not available to test the validity of child custody decrees that are within the jurisdiction of a tribal court. *Azure-Lone Fight v. Cain*, 317 F. Supp. 2d 1148, 1151 (D.N.D. 2004) ("[H]abeas corpus relief is generally not available to challenge the validity or propriety of tribal court decisions in child custody disputes."); *LaBeau v. Dakota*, 815 F. Supp. 1074, 1076 (W.D. Mich. 1993) ("[F]ederal courts do not have jurisdiction to review child custody decisions that are within the jurisdiction of a tribal court."); *Sandman v. Dakota*, 816 F. Supp. 448, 451 (W.D. Mich. 1992), *aff'd* 7 F.3d 234 (6th Cir. 1993) ("[A] writ of habeas corpus is not available to test the validity of the child custody decree issued by the tribal court."); *Shelifoe v. Dakota*, 966 F.2d 1454 (Table) (6th Cir. 1992) ("A writ of habeas corpus under 25 U.S.C. § 1303 does not provide a remedy for an alleged violation of § 1302 in a civil domestic matter."); *Weatherwax v. Fairbanks*, 619 F. Supp. 294, 296 (D. Mont. 1985) ("[F]ederal habeas corpus relief under 25 U.S.C. § 1303 is not available to test the validity of a child custody decree of an Indian tribal court."); *Johnson v. Jones*, Case No. 6:05-cv-1256-Orl-22KRS, 2005 WL 8159765, at *3 (M.D. Fla. Nov. 3, 2005) ("[H]abeas corpus is an improper means of challenging the tribe's dependency determination."); *Goslin v. Kickapoo Nation District Court*, Case No. 98-4107-SC, 1998 WL 1054223, at *3 (D. Kan. Dec. 2, 1998) ("[A] petition for habeas corpus under 25 U.S.C. § 1303 is not a proper vehicle" to challenge a tribal court's child custody decisions.).

The Tenth Circuit has "recognized that the detention language in § 1303 is analogous to the 'in custody' requirement contained in the other federal habeas statutes." *Valenzuela v. Silversmith*, 699 F.3d 1199, 1203 (10th Cir. 2012) (alterations omitted). As the Supreme Court explained in *Lehman v. Lycoming County Children's Services Agency*, 458 U.S. 502, 511 (1982),

"[t]he 'custody' of foster or adoptive parents over a child is not the type of custody that traditionally has been challenged through federal habeas." Applying *Lehman*, the Tenth Circuit has held that "[a] child placed in a foster home does not meet the 'in custody' requirement of 28 U.S.C. § 2254." *See Roman-Nose v. New Mexico Dept. of Human Services*, 967 F.2d 435, 436 (10th Cir. 1992); *see also Anderson v. Colorado*, 793 F.2d 262, 263 (10th Cir. 1986) (holding plaintiff "may not use federal habeas corpus as a vehicle to undo the [state court's] custody decision").

Taking these cases together, this court concludes that tribal court child custody determinations do not constitute "detention" for purposes of § 1303. Plaintiffs attempt to distinguish these cases in four ways. First, they argue the federalism concerns underlying federal courts' refusal to review state court child custody decisions do not apply to tribal court decisions. In *Lehman*, the Supreme Court counseled that "[t]he federal writ of habeas corpus, representing as it does a profound interference with state judicial systems and the finality of state decisions, should be reserved for those instances in which the federal interest in individual liberty is so strong that it outweighs federalism and finality concerns." *Lehman*, 458 U.S. at 515-16. Federalism concerns are absent here, but federal policies grounded in comity and encouraging tribal self-government are present. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) ("We have repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government."). "Tribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development." *Id.* at 14-15 (internal citation omitted); *see also Norton*, 862 F.3d at 1249 (The Supreme Court has "repeatedly recognized tribal courts as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians."). Accordingly, the potential for

interference in tribal judicial systems and the finality of tribal decisions counsels against the application of § 1303 to tribal court child custody decisions.

Second, plaintiffs argue that habeas relief should be available because it has been used in child custody cases in some states and in England.  The Supreme Court rejected this argument in *Lehman*, explaining that "reliance on what may be appropriate *within* the federal system or *within* a state system is of little force where—as in this case—a *state judgment* is attacked collaterally in a *federal* court." *Lehman*, 458 U.S. at 514 (emphasis original).  Similarly, the use of habeas corpus in England or some states does not justify the application of § 1303 to include federal review of tribal court custody decisions.  Accordingly, plaintiffs' attempts to distinguish *Lehman* and its progeny based on English common law and state court decisions—all of which were issued prior to *Lehman*—are unavailing.

Third, plaintiffs argue that "at least two Circuit Courts of Appeal have found that, where a dispute exists over whether a tribal court violates due process rights, habeas corpus jurisdiction is appropriate." [Doc. 32, p. 18].  In *DeMent v. Oglala Sioux Tribal Court*, 874 F.2d 510, 513 (8th Cir. 1989), the Eighth Circuit held "the ICRA does create a cause of action as well as federal habeas jurisdiction under appropriate circumstances" in child custody disputes.  There, the "basic dispute" was "whether California or the tribe had jurisdiction to determine the custody of DeMent's children" as the tribal court refused to enforce a California custody decree.  *Id.*  The Eighth Circuit reasoned that "[t]he question of whether an Indian tribe has the power to compel a non-Indian to submit to the civil jurisdiction of a tribal court is a federal question under 28 U.S.C. § 1331." *Id.* "[W]e believe that habeas corpus relief is available under section 1303 to determine . . . the appropriateness of the tribal court's exercise of jurisdiction." *Id.* at 515.  Similarly, in *United States ex rel. Cobell v. Cobell*, 503 F.2d 790, 791 (9th Cir. 1974), the Ninth Circuit considered

whether § 1303 was appropriate in a "unique child custody struggle involving the conflicting jurisdictional claims of the Montana state courts and the Blackfeet Tribal Court." The Ninth Circuit determined the district court properly granted a writ of habeas corpus where "the Tribal Court lacked jurisdiction to determine the custody of the Cobell children." *Id.* at 795. In both cases, federal jurisdiction existed to determine the narrow question of whether the tribal court exceeded its jurisdiction in issuing the relevant child custody orders.

To the extent plaintiffs ask this court to review the propriety of Judge Barteaux's decisions, both *Dement* and *Cobell* are distinguishable. Here, there are no competing state and tribal custody decrees. *See Johnson*, 2005 WL 8159765, at *3 n. 5 ("The present case, in contrast [to *DeMent*], does not involve competing custody decrees. Accordingly, there is no reason to except this case from the general prohibition against exercising habeas jurisdiction in child custody disputes."). Plaintiffs allege the tribal court proceedings were conducted "in derogation of" K.P's "rights under the Indian Child Welfare Act to be placed with a member of his extended family," UKB's rights to "specif[y] placement with Pritchett as the Minor Child's extended family" under ICWA, and "the rights of Pritchett as next friend and extended family member of the Minor Child, who the Indian child's tribe has selected for placement under [ICWA]." [Doc. 20, p. 26, ¶ 97]. Essentially, plaintiffs ask this court to consider whether Judge Barteaux violated ICWA. Section 1303 does not permit this court to make such a determination.[4] *Cf. Roman-Nose*, 967 F.2d 435 (ICWA provided cause of action to determine whether state court violated ICWA, not 28 U.S.C. § 2254).

---

[4] Further, ICWA's placement provisions do not, by their terms, apply to tribal court proceedings. 25 U.S.C. § 1915; 25 C.F.R. § 23.103(b)(1) ("ICWA does not apply to . . . [a] Tribal court proceeding."); *see also Cohen's Handbook of Federal Indian Law*, § 11.02[3] (2012) ("[T]he dominant view is that ICWA's mandates are inapplicable to Indian child custody proceedings unless the statute specifically mentions tribal court proceedings," that is, the full faith and credit clause found in 25 U.S.C. § 1911(d)).

However, as plaintiffs point out, "[t]his case, like *DeMent and Cobell*, [also] involves a challenge to the jurisdiction of the CNO courts over the juvenile case and the adoption case." [Doc. 32, p. 19].  And, indeed, a handful of courts have read *DeMent* to mean § 1303 review of tribal court custody orders is appropriate where a tribal court has acted outside of its jurisdiction. *LaBeau*, 815 F. Supp. at 1077 ("A habeas action can be brought against a tribal court if it has acted outside of its jurisdiction." (citing *DeMent*, 874 F.2d at 515)); *Shelifoe*, 966 F.2d 1454 (Table) ("[T]he [§ 1303] remedy may be available to challenge the jurisdiction of the tribal court in limited circumstances." (citing *DeMent*, 874 F.2d at 513)).

In *DeMent*, the Eighth Circuit acknowledged that "[f]ederal habeas corpus . . . has generally not been available to challenge a state decree on parental rights or custody." *DeMent*, 874 F.2d at 515 (citing *Lehman*, 458 U.S. at 511).  The *DeMent* court distinguished *Lehman*, explaining that "in *Lehman*, the parent seeking federal habeas relief merely sought to collaterally attack the state court's custody decision."  *Id.*  In contrast, the *DeMent* case "no longer represent[ed] a child custody battle; it ha[d] become a dispute over whether a tribal court violates a non-Indian's due process rights by refusing to give full faith and credit to a state custody decree."  *Id.*  Thus, the Circuit panel concludes that the legal issue involved in *DeMent* was distinguishable from that sought to be resolved in *Lehman*.  *Id.*  In addition, the panel "believe[d] that DeMent's children [were] being detained by the tribe by an order of the tribal court" because

> The tribal court made the girls wards of the court . . . and has refused to enforce the California custody decree. . . . If DeMent is correct and the California decree is valid, a federal court order may be the only way to compel the tribe to return the child to their father.  Thus, we believe that habeas corpus relief is available under section 1303 to determine the validity of the California decree and the appropriateness of the tribal court's exercise of jurisdiction.

*Id.* Similarly in this case, if plaintiffs are correct that the Cherokee Nation lacked jurisdiction over the Juvenile Deprived and Adoption Proceedings, federal relief "may be the only way to compel

[the Nation] to return the child." *See DeMent*, 874 F.2d at 515.  In this way, *DeMent* is persuasive. Moreover, a Tenth Circuit panel in an unpublished decision has recognized that federal question jurisdiction exists to determine whether a tribal court has exceeded the lawful limits of its jurisdiction.  *Harvey v. Star*, 96 F.3d 1453 (Table) (10th Cir. 1996) (unpublished).[5]

On review of the parties' arguments and the relevant case law, this court is persuaded it has jurisdiction to determine whether the Cherokee Nation exceeded its jurisdiction in the Juvenile Deprived and Adoption Proceedings.  This jurisdiction does not stem from the "detention" language in § 1303.  Instead, it flows from the general federal question statute, 28 U.S.C. § 1331. *See Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 852 (1985) ("The question whether an Indian tribe" has jurisdiction in a particular civil dispute "is one that must be answered by reference to federal law and is a 'federal question' under § 1331."); *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1234 (10th Cir. 2014) ("[T]he scope of a tribal court's jurisdiction is a federal question over which federal district courts have jurisdiction."); *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 892 n. 20 (2d Cir. 1996) ("Child custody cases of this sort," *i.e.* those involving jurisdictional challenges, "are perhaps better characterized as falling under 28 U.S.C. § 1331: whether a tribal court has properly exercised jurisdiction presents a federal question."); *see also Harvey*, 96 F.3d 1453 ("In *National Farmers*, the Supreme Court held that a federal court is empowered to determine under 28 U.S.C. § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction."  (quoting *Arizona Pub. Serv. Co. v. Aspaas*, 77 F.3d 1128, 1132 (9th Cir. 1995) (alteration omitted))).

Plaintiffs' fourth argument in support of a broader reading of the § 1303 detention requirement is that "the use of habeas corpus under ICRA has been extended to tribal disenrollment

---

[5] "Unpublished decisions are not precedential, but may be cited for their persuasive value."  10th Cir. R. 32.1.

actions[,]" which, in plaintiffs' view, are "analogous" to this case.  [Doc. 32, p. 19].  However, disenrollment and banishment decisions are distinguishable.  In *Poodry*, a banishment decision plaintiffs cite in support, the Second Circuit Court of Appeals concluded that permanent banishment was a severe restraint on liberty, and a federal district court had subject matter jurisdiction to review the legality of such an order.  The *Poodry* court recognized the decisions holding that federal habeas relief is not available under § 1303 to test the validity of a child custody decree of an Indian tribal court (*Poodry*, 85 F.3d at 892-93), but saw in those decisions no basis upon which to construe ICRA's habeas corpus provision more broadly than analogous statutes. Because plaintiffs in the instant case challenge the validity of tribal court child custody decrees, the cases analyzing disenrollment decisions do not support plaintiffs' position.

In sum, defendant is correct that federal courts lack jurisdiction under § 1303 to review the propriety of tribal court child custody decisions because the child is not "detained" for purposes of the statute.  However, federal question jurisdiction exists to determine whether a tribal court has exceeded its jurisdiction, even in child custody cases.  As a result, this court lacks jurisdiction to review the tribal court's compliance with ICWA [*see* Doc. 20, p. 26, ¶ 97], but has jurisdiction to entertain plaintiffs' "challenge to the jurisdiction of the CNO courts over the juvenile case and the adoption case." [Doc. 32, p. 19].

### 2.  Exhaustion of Tribal Court Remedies

Defendant argues that the habeas claim fails because plaintiffs have not exhausted their remedies in tribal court.

In evaluating defendant's exhaustion argument, the court considers only the facts as alleged in the Amended Complaint—which the court accepts as true and views in the light most favorable to the plaintiff—and the tribal court filings and orders located at Doc. 25-1, of which the court takes judicial notice.  *See Free v. Dellinger*, Case No. 18-cv-181-CVE-JFJ, 2018 WL 3580769, at

16

*3 (N.D. Okla. July 25, 2018) ("The Court finds that it can take judicial notice of [tribal court filings] without converting the pending motions to dismiss into motions for summary judgment." (citing *Hodgson v. Farmington City*, 675 F. App'x 838, 840-41 (10th Cir. 2017) (unpublished)). The court disregards other declarations of fact and documents submitted by the parties for the purpose of deciding the motion.

"The tribal exhaustion rule requires that 'absent exceptional circumstances, federal courts typically should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted.'" *Thlopthlocco*, 762 F.3d at 1237 (quoting *Crowe*, 640 F.3d at 1149). Indeed, the *DeMent* court, after determining the federal district court had jurisdiction to evaluate whether the tribal court exceeded its authority in entering the child custody order, nonetheless reversed the district court's determination that the tribal court lacked jurisdiction because DeMent failed to exhaust the jurisdictional dispute in tribal court. *DeMent*, 874 F.2d at 516; *see also Harvey*, 96 F.3d 1453 (Table) (modifying the district court's order to reflect abstention as proper basis for dismissal).

Plaintiffs argue in their response that they exhausted their tribal court remedies, and that they were not parties to the Adoption Proceeding and had no notice of it until after the Final Decree. But, plaintiffs neither allege nor point to any tribal court filings indicating that they made any effort to raise their jurisdictional challenge at any time in tribal court, either in the tribal court proceedings or by way of post-judgment motions to the trial court, or on appeal to the Cherokee Nation Supreme Court.[6] "Under the tribal exhaustion rule, '[u]ntil petitioners have exhausted the remedies available to them in the Tribal Court system, it [is] premature for a federal court to

---

[6] On January 10, 2020, plaintiffs filed a "Supplemental Notice and Request for Clarification Regarding Opinion of the Court issued on October 28, 2019" with the Cherokee Nation Supreme Court. The notice and request do not cite any jurisdictional concerns. [Doc. 25-1, pp. 69-74].

17

consider any relief.'"  *Valenzuela*, 699 F.3d at 1207 (alterations in original) (quoting *Nat'l Farmers*, 471 U.S. at 857); *see also Nat'l Farmers*, 471 U.S. at 856 ("We believe that [the jurisdictional] examination should be conducted in the first instance in the Tribal Court itself.").  Because they have not sought available relief in tribal court, plaintiffs have failed to exhaust their tribal court remedies.  *See Valenzuela*, 699 F.3d at 1207.

Plaintiffs argue in the alternative that they are not subject to the exhaustion rule.  "The proper scope of the tribal exhaustion rule is a legal issue."  *Norton*, 862 F.3d at 1242 (internal citations and quotation marks omitted).  "[T]he Supreme Court has explained that exhaustion of tribal remedies is not required where (1) an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, (2) the action is patently violative of express jurisdictional prohibitions, or (3) exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction."  *Valenzuela*, 699 F.3d at 1207 (internal quotation marks omitted) (quoting *Nevada v. Hicks*, 533 U.S. 353, 369 (2001)).  "To invoke these exceptions," the Tenth Circuit requires "that the party make a substantial showing of eligibility."  *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1238 (10th Cir. 2014) (citing *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1502 (10th Cir. 1997)).  "Because [the Tenth Circuit] has taken a strict view of the tribal exhaustion rule, the exceptions are applied narrowly."  *Norton*, 862 F.3d at 1243 (internal citations and quotation marks omitted).  "Exceptions typically will not apply so long as tribal courts can make a colorable claim that they have jurisdiction."  *Id.*

Plaintiffs contend that Judge Barteaux conducted the Juvenile Deprived and Adoption Proceedings in bad faith because the defendant failed to notify the UKB of the Juvenile Deprived Proceeding when the proceeding began; prevented the UKB's ICW Department from taking part in the Juvenile Deprived Proceeding as required by ICWA and Cherokee Nation law; denied the

UKB's motion to intervene in the Juvenile Deprived Proceeding; opened the separate Adoption Proceeding without notice to counsel for the UKB or Pritchett; and rushed the adoption to judgment before it held a hearing on the UKB's second motion to intervene in the Juvenile Deprived Proceeding, then closed the Juvenile Deprived Proceeding on the day of the hearing. [Doc. 32, pp. 22-23].

Despite the Cherokee Nation Supreme Court's admonition to the District Court regarding notice, and despite the fact that the UKB's Attorney General had entered a formal appearance on behalf of the UKB in the Juvenile Deprived Proceeding, the Cherokee Nation allegedly did not provide notice to UKB's Attorney General of the Supreme Court's Opinion, Judge Barteaux's Additional Order Regarding UKB Intervention and Review, or of any subsequent proceeding involving the child in the Juvenile Deprived Proceeding.  The UKB alleges it learned anecdotally of the Cherokee Nation Supreme Court's Order, and the UKB's Attorney General filed a Second Motion to Intervene in the Juvenile Deprived Proceeding on December 5, 2019.  Judge Barteaux then set the motion for hearing on December 19, 2019, three days *after* the scheduled hearing on the Final Adoption Decree.

In light of the Cherokee Nation trial court's alleged failure to provide notice to UKB's counsel of record of court proceedings and filings in the Juvenile Deprived Proceeding, and the setting of the UKB's motion for hearing three days after the Hearing on the Final Decree of Adoption, plaintiffs have raised an issue as to whether the Juvenile Deprived Proceeding was conducted in bad faith.[7]  However, the allegations and tribal court records fall short of a substantial

---

[7] The Adoption Proceeding was a separate proceeding, and plaintiffs do not specifically allege that the UKB ICW Advocate did not receive notice of that proceeding at the address listed in the Federal Register.  Rather, plaintiffs allege that the UKB Attorney General did not receive "any prior notice of [the] adoption proceeding," that "plaintiffs were not parties to the adoption

showing that the defendant's *assertion of tribal jurisdiction* was conducted in bad faith.   *See Thlopthlocco*, 762 F.3d at 123 (The Supreme Court has recognized an exception to exhaustion where "an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith.").   As a result, the bad faith exception to the tribal exhaustion rule is inapplicable here.

Plaintiffs next argue the Cherokee Nation lacks jurisdiction over Juvenile Deprived and Adoption Proceedings, and, as a result, exhaustion would be futile and serve no purpose other than delay.   Courts confronting similar arguments have found exhaustion to be futile.   *Comstock Oil & Gas Inc. v. Alabama & Coushatta Indian Tribes of Texas*, 261 F.3d 567, 572 (5th Cir. 2001) ("Because no tribal court properly existed, exhaustion was imprudent in the present dispute."); *Krempel v. Prairie Island Indian Cmty.*, 125 F.3d 621, 622 (8th Cir. 1997) ("Case law supports the notion that if there is no functioning tribal court, exhaustion would be futile and therefore would not be required."); *see also Thlopthlocco*, 762 F.3d at 1239 ("[O]ther circuits have held that the futility exception also bars application of the tribal exhaustion rule to tribes whose constitution does not create a judiciary.").   The reasoning of the United States District Court for the Eastern District of Texas on the issue is persuasive:

> [I]n this case, the court is faced with a scenario in which one possible outcome of the jurisdictional analysis is the non-existence of a tribal court [under federal law], in which case there would be no reason to refrain from exercising the court's jurisdiction.
>
> . . .
>
> Such a position is supported in several ways. First, sheer common sense indicates that if there are no existing remedies, there is nothing to exhaust. Secondly, and related to the first, such a scenario may not fall within the scope of the language discussing the scope of the doctrine as found in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987) (requiring that a petitioner "exhaust all available tribal remedies before instituting suit").

---

proceeding," and that plaintiffs "were given no notice of the adoption before the Final Decree of Adoption was entered."   [Doc. 20, p. 22, ¶¶ 79, 82].

> Plaintiff emphasized the use of the word "available" to illustrate that one could hardly consider a non-existent court as an available remedy. Though the context of the statement within *Iowa Mutual* may not warrant such emphasis on that particular use of words, the same concept finds support in *National Farmers.* There, the court discussed the notion that an examination of tribal jurisdiction "should be conducted in the first instance in the Tribal Court itself." *National Farmers Union*, 105 S.Ct. at 2454. Implicit within that notion is that the tribal court actually and properly exist. Under these circumstances we are not assessing the mere jurisdiction of the court but the actual existence of the court. As such, this court is not usurping any role of the tribal court in determining its own existence.

*Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes of Texas*, 78 F. Supp. 2d 589, 596-97 (E.D. Tex. 1999), *aff'd in part and rev'd on other grounds*, 261 F.3d 567 (5th Cir. 2001). That reasoning applies here. Plaintiffs ask this court to construe federal law, namely the Curtis Act and the Oklahoma Indian Welfare Act, to determine whether the Cherokee Nation's tribal courts properly exist. As in *Comstock*, if plaintiffs' are correct, "exhaustion of remedies is inapplicable." *See id.* at 597.

Plaintiffs have made a substantial showing of futility, excepting them from the tribal exhaustion rule as to their jurisdictional argument. As a result, the court declines to dismiss plaintiffs' jurisdictional challenge for failure to exhaust tribal remedies and will consider plaintiffs' jurisdictional arguments. *See Comstock*, 78 F. Supp. 2d at 598-600 (determining whether tribal court was properly created on motion to dismiss).

### 3. Jurisdictional Analysis

As noted above, plaintiffs argue the Cherokee Nation District Court lacks jurisdiction as a matter of federal law. In support, plaintiffs contend the Curtis Act, 30 Stat. 495 (June 27, 1898), abolished the Cherokee Nation's courts and the courts have not been properly reestablished. And, plaintiffs argue, the Cherokee Nation's 1999 Constitution has not been federally approved.

21

Defendant disagrees, arguing the Curtis Act has been repealed by the Oklahoma Indian Welfare Act (OIWA), 25 U.S.C. §§ 5201-5210.[8]

"[T]he 1898 Curtis Act 'abolished' all tribal courts, prohibited all officers of such courts from exercising 'any authority' to perform 'any act' previously authorized by 'any law,' and transferred 'all civil and criminal causes then pending' to the U.S. Courts for the Indian Territory." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2490 (2020) (Roberts, C.J., dissenting) (quoting Curtis Act, § 28, 30 Stat. at 504-05). "In the same Act, Congress completed the shift to a uniform legal order by banning the enforcement of tribal law in the newly exclusive jurisdiction of the U.S. Courts" and "established municipalities to govern both Indians and non-Indians." *Id.* (citing Curtis Act, §§ 14, 26, 30 Stat. at 499, 504).

In 1936, Congress—as part of its effort to repudiate its earlier policies of termination—passed the OIWA. Like the Indian Reorganization Act of 1934, the OIWA authorizes tribes to organize "for [their] common welfare," adopt constitutions, and receive charters of incorporation. 25 U.S.C. § 5203.

The OIWA contains a general repealer clause: "All Acts or parts of Acts inconsistent with this chapter are repealed." 25 U.S.C. § 5209. The Curtis Act is such an act. Where the Curtis Act restricted tribes' governmental powers, Congress—in passing the OIWA— "enacted legislation to restore governmental powers to the Oklahoma tribes." *Indian Country, U.S.A., Inc. v. State of Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 981 (10th Cir. 1987). Accordingly, the Curtis Act is "inconsistent" with the OIWA and, as a result, "repealed." 25 U.S.C. § 5209.

---

[8] Defendant also notes that "the Cherokee Nation's 1902 allotment agreement superseded the Currtis Act's courts provision," but states "this Court need not reach that issue here." [Doc. 35, p. 13].

In a case involving the Muscogee (Creek) Nation, the United States Court of Appeals for the District of Columbia Circuit reached the same conclusion. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1443-46 (D.C. Cir. 1988) ("[W]e hold that the Curtis Act was repealed by the OIWA."). The D.C. Circuit reasoned that it is "reasonable to conclude that the OIWA conferred all powers associated with self-government, limited of course by statutes of *general* applicability" on Oklahoma tribes. *Id.* at 1445. And, "[i]t did away with allotment and included a provision for establishing a tribal government." *Id.* That is, the OIWA "appears to cover the 'whole subject' of the earlier legislation," the Curtis Act. *Id.* Accordingly, it "operate[s] to repeal the earlier act." *Id.* The D.C. Circuit acknowledged its conclusion "was not free from doubt," but explained that the OIWA must be construed in favor of the tribe as repealing the Curtis Act and permitting the establishment of tribal courts. *Id.* at 1445-46. The D.C. Circuit concluded: "Accordingly, we hold that the Curtis Act was repealed by the OIWA." *Id.*

Plaintiffs attempt to distinguish the D.C. Circuit's decision, arguing that the Creeks, unlike the Cherokee Nation, reorganized under the Oklahoma Indian Welfare Act. [Doc. 32, p. 26]. They further contend that, "[b]ecause the CNO did not organize its 1976 Constitution under the OIWA, the Curtis Act's abrogation of its power to create tribal courts with civil jurisdiction remains in full force and effect." [*Id.*, p. 27]. However, neither the OIWA's language nor the D.C. Circuit's analysis indicate the OIWA's repeal of the Curtis Act is dependent on tribal reorganization under the OIWA. Instead, the revocation was effective at enactment. *See* 25 U.S.C. § 5209 ("All Acts or parts of Acts inconsistent with this Act **are repealed**." (emphasis added)). Thus, whether the Cherokee Nation subsequently reorganized under the OIWA is not determinative; the OIWA repealed the Curtis Act and the Cherokee Nation tribal court properly exercised jurisdiction in the Juvenile Deprived Proceeding and the Adoption Proceeding involving K.P.

23

As noted above, plaintiffs also argue:

> The CNO's 1999 Constitution, which created the Defendant's court and the Defendant's position as Judge, has not been federally approved. The CNO cannot create courts with civil jurisdiction over child custody matters until the CNO reorganizes under the OIWA, which is the only method available to repeal the Curtis Act's prohibition on Cherokee tribal courts. Without federal approval, the CNO court lacks any jurisdiction over the minor child who is the subject of this action.

[Doc. 32, p. 28].   However, as discussed above, the Curtis Act is repealed and does not operate as a barrier to the creation of tribal courts.   Moreover, as the Tenth Circuit has explained, "the Cherokee Nation still possesses an inherent right to self-government that is recognized by legal authorities and supported by federal policy" despite the fact that it has not reorganized under the OIWA.   *Wheeler v. United States Dep't of Interior, Bureau of Indian Affairs*, 811 F.2d 549, 550 (10th Cir. 1987).   This established right to self-government includes the power to create tribal courts with jurisdiction over child custody matters arising on the reservation or involving members.   *See Fisher v. District Court of Sixteenth Judicial District*, 424 U.S. 382, 387 (1976) (explaining "[s]tate-court jurisdiction [over a child custody proceeding] plainly would interfere with the powers of self-government conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court"); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 42 (1989) ("Tribal jurisdiction over Indian child custody proceedings is not a novelty of the ICWA."); *Johnson*, 2005 WL 8159765, at \*2 ("The [tribal] dependency proceeding involves a domestic matter of paramount importance to Indian tribes, over which this tribe possesses inherent sovereign authority.").   Accordingly, this court concludes that the Cherokee Nation's ability to create tribal courts with jurisdiction over child custody matters is not dependent on reorganization under the OIWA.   Nor do plaintiffs point to any federal statute or treaty conditioning the ability to create tribal courts on federal approval of the Nation's constitution.   *See United States v. Wheeler*,

24

435 U.S. 313, 323 (1978) ("In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."). Accordingly, plaintiffs' jurisdictional arguments are without merit and Count I is dismissed.

## B.  Declaratory and Injunctive Relief

In their second cause of action, plaintiffs ask this court to "enter judgment declaring that the CNO courts do not have jurisdiction over the UKB or the Minor Child and enjoining the jurisdiction of such courts over the UKB or the Minor Child" and "further request the Court enter judgment declaring the February 27, 2019 Order null and void and setting aside and vacating any purported final decree of adoption with respect to the Minor Child." [Doc. 20, pp. 28-29, ¶¶ 108, 110].   Plaintiffs argue that this court has authority to issue declaratory relief by exercising jurisdiction under ICRA.  [Doc. 32, p. 29].  However, under Supreme Court precedent, declaratory and injunctive relief and money damages are not available under the ICRA.  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 69-70 (1978) (relief under ICRA is limited to a writ of habeas corpus); *Kaw Nation ex rel. McCauley v. Lujan*, 378 F.3d 1139, 1142 (10th Cir. 2004).  Plaintiffs' request for declaratory and injunctive relief under ICRA must be dismissed for lack of jurisdiction.

Plaintiffs also seek a "declaratory order that the UKB is the Indian child's tribe under the ICWA" and that "CNO violated the rights of the UKB under ICWA."  [Doc. 20, p. 29, ¶¶ 111-12]. The only statutory basis cited for these requests is the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  [*Id.*, p. 27, ¶ 103].   However, the Declaratory Judgment Act "does not extend the jurisdiction of federal courts; it only enlarges the range of remedies available.  Power to issue declaratory judgments must lie in some independent basis of jurisdiction."  *Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) (internal quotation marks and citation omitted).  It does not appear that such an independent basis exists.   ICWA does not provide for review of tribal court proceedings.  *Cf.* 25 U.S.C. § 1914 (providing for review of state court proceedings).  Nor does §

1303 permit federal review of tribal court proceedings for compliance with ICWA.  *See Goslin*, 1998 WL 1054223, at *4.  Accordingly, plaintiffs' request for a "declaratory order that the UKB is the Indian child's tribe under the ICWA" and that "CNO violated the rights of the UKB under ICWA" is dismissed for lack of jurisdiction.

**IV.  Conclusion**

 WHEREFORE, the Motion to Dismiss [Doc. 23] of defendant T. Luke Barteaux, Presiding District Judge for the District Court of the Cherokee Nation of Oklahoma, is granted.

 IT IS SO ORDERED this 30th day of September, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE